Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                                Plaintiffs,

          -against-

KONATA SOLOMON STALLINGS (A Sole Proprietorship),
KONATA SOLOMON STALLINGS, PSY.D., GARY
GRODY a/k/a LANCE GRODY, OLIVER CONSULTING,
L.L.C., TREVOR PALMER, JASNETH MITCHELL,
JOCELYN CACERES, STEFANIE ZAZZERA,
MICKAELLE DOUGHERTY, and JOHN DOE
DEFENDANTS "1" through "10",

                                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:_____ (     )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Konata Solomon Stallings (A Sole

Proprietorship), Konata Solomon Stallings, Psy.D., Gary Grody a/k/a Lance Grody, Oliver

Consulting, LLC, Trevor Palmer, Jasneth Mitchell, Jocelyn Caceres, Stefanie Zazzera, Mickaelle

Dougherty, and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $500,000.00 that Defendants have wrongfully obtained from GEICO by submitting, or causing to be submitted, hundreds of fraudulent, unlawful and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including diagnostic interviews, psychological testing, and psychotherapy (collectively, the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $483,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Konata Solomon Stallings (A Sole Proprietorship) (hereinafter, referred to as "SSP") because:

    (i)      the Fraudulent Services were allegedly provided by and billed through SSP, which is a healthcare "practice" not under the control and direction of Konata Solomon Stallings ("Stallings").  Rather, at all relevant times, SSP was operated, managed, and controlled by Gary Grody a/k/a Lance Grody ("Grody"), Oliver Consulting, L.L.C. ("Oliver"), an entity owned and controlled by Grody, and the John Doe Defendants (as defined below) for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

    (ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of Grody, the John Doe Defendants and other unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics (as defined below);

    (iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants,

2

rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv) the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided to inflate the charges submitted to GEICO; and

(v) the Fraudulent Services were provided, to the extent provided at all, by: (a) unsupervised social workers and other unlicensed persons; and/or (b) individuals who were not employed by SSP, but who actually were employed by Grody.

3. Specifically, the fraudulent scheme can be described as follows:

(i) Stallings associated with Grody and the John Doe Defendants "1" through "10" (hereinafter, the "John Doe Defendants") and allowed his name and professional license to be used by them to establish SSP and allowed Grody, Oliver, and the John Doe Defendants to secretly own, operate, manage and control SSP;

(ii) through unlawful financial arrangements, Grody, Oliver and the John Doe Defendants established relationships with a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (hereinafter, the "Clinics");

(iii) Grody, Oliver and the John Doe Defendants arranged to have Stallings enter into "funding" agreements with various companies to provide for advances against the account receivables associated with the Fraudulent Services for the purposes of making the payments needed to fund the fraudulent scheme, including the unlawful financial relationships with the Clinics;

(iv) Grody and the John Doe Defendants recruited individuals who performed the Fraudulent Services despite the fact that they were not employed by Stallings or SSP, and many of whom were not licensed to render the Fraudulent Services in the first instance. Instead, these individuals were paid by Grody in cash or through Oliver. Specifically, the Fraudulent Services were provided by social workers and other unlicensed individuals including Trevor Palmer, Jasneth Mitchell, Jocelyn Caceres and Stefanie Zazzera (collectively, referred to hereinafter as the "Social Worker Defendants") as well as Mickaelle Dougherty, Ph.D, a psychologist employed by Grody, not by Stallings or SSP, at the Clinics, consisting of more than twenty (20) separate locations during a period of approximately seven (7) months, and resulted in the generation of falsified reports regarding the scope of the services and the clinical findings; and

       (v)     Stallings, Grody, and the John Doe Defendants used the falsified reports to submit bills through SSP seeking payment from GEICO and other New York automobile insurers for thousands of dollars per Insured, per date of treatment.

4.     Once the pieces were in place, Grody and the John Doe Defendants: (i) used Stallings' psychology license, electronic copies of his signature and the tax identification number of SSP to generate large volumes of false and fraudulent documents, including NF-3 forms (i.e., bills), assignment of benefit forms, and medical records; and (ii) used SSP as a fictional healthcare "practice" to serve as the billing vehicle through which millions of dollars of billing for the Fraudulent Services was submitted to GEICO and other New York automobile insurers.

5.     Because SSP was nothing more than a shell to hide the participation of Grody, Oliver and the John Doe Defendants in the fraudulent scheme, it was equally critical to the success of the fraudulent scheme for Stallings, Grody, Oliver and the John Doe Defendants to partner with New York collection attorneys who were willing to:

       (i)     purport to represent Stallings and SSP;

       (ii)    associate with the funding companies, Grody, Oliver and the John Doe Defendants in connection with the unlawful scheme;

       (iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly: (a) submitting fraudulent bills to the insurers for the Fraudulent Services; and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

       (iv)   accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including Grody, Oliver and the John Doe Defendants.

6.     Grody and the John Doe Defendants used the information received from Stallings to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records; and (ii) the engagement letters and associated documents needed by the collection lawyers to bill and collect

on the Fraudulent Services.  Thereafter, Grody and the John Doe Defendants provided the package of documents associated with billing, collection, and funding efforts to the collection lawyers and thereafter, began to transfer the fabricated claim documents to them.  Once the documents were processed by the collection lawyers into bills (i.e., "NF-3" forms) using the name of SSP, they organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.

7.     Once the claims were compiled and submitted to GEICO, they were transferred/assigned to the funding companies as part of an effort to exercise total and exclusive control over SSP and its only assets (i.e., the income stream from the claims).  Once the documents were in place with the funding companies, money was transferred to Grody, through entities he controlled such as Oliver and the John Doe Defendants, disguised as "advances" against the claims for the Fraudulent Services. The John Doe Defendants were not signatories to the funding agreements, received the money without risk, and used the payments received from the funding companies for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

8.     As set forth herein, the Defendants, at all relevant times, have known that:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants,

5

rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     in many cases, the Fraudulent Services never were provided in the first instance;

(v)      the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and

(vi)     the Fraudulent Services were provided, to the extent provided at all, by: (a) unsupervised Masters of Social Workers ("MSWs") and other unlicensed persons, in contravention of New York law; and/or (b) individuals who were not employed by SSP, but who were employed by Grody.

9.      As such, the Defendants are not and have never been eligible to be compensated for the bills they submitted to GEICO through SSP.

10.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent charges that Defendants have submitted or caused to be submitted to GEICO, through SSP, using the United States mails.

11.     The Defendants' fraudulent scheme began no later than 2021 and has continued uninterrupted since that time.  The Defendants continue to pursue collection against GEICO on the Fraudulent Services through the prosecution of lawsuits and arbitrations.

12.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $500,000.00.

## THE PARTIES

### I.     Plaintiffs

13.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.   **Defendants**

14.     Defendant Grody resides in and is a citizen of New York.  Grody holds himself out to the public to be a licensed clinical psychologist.  In fact, Grody is a convicted felon who is not licensed to practice psychology or any other profession in the State of New York.  Grody is uniquely familiar with how to manipulate New York's no-fault system to defraud insurance companies out of money for the financial benefit of himself and those with whom he associates.

15.     In 2002, Grody was indicted in the Eastern District of New York and ultimately pleaded guilty in 2003 to three (3) separate counts in connection with a previous insurance fraud scheme, which resulted in him: (i) being imprisoned for more than a year and serving a supervised release for a period of three years; and (ii) paying restitution to Allstate Insurance Company of more than $280,000.00.

16.     Grody's federal imprisonment did not have the intended deterrent effect as, shortly after he was released, he became involved in a series of fraudulent insurance schemes that resulted in at least four (4) major automobile insurance companies filing a series of civil recovery actions against him and various others, with more than $10 million in judgments ultimately being entered against him.  Based on the relevant court records, those judgments remain unsatisfied to date, and Grody remains incapable of openly operating within the healthcare industry or engaging in any legitimate activity, thereby contributing to his motive to engage in the furtive, fraudulent and unlawful conduct described herein.

17.     Defendant Oliver is a New York Limited Liability Company that has its principal place of business in New York and operates in New York.  Grody is the sole member of Oliver

7

and used Oliver as a vehicle to issue and receive payments related to the fraudulent scheme described herein.

18.     Defendant Stallings resides in and is a citizen of New York.  At all relevant times, Stallings was a registered clinical psychologist who purported to provide many of the Fraudulent Services that were billed to GEICO through SSP.

19.     Defendants Trevor Palmer ("Palmer"), Jasneth Mitchell ("Mitchell"), Jocelyn Caceres ("Caceres") and Stefanie Zazzera ("Zazzera") all reside in and are citizens of New York. At all relevant times, Palmer, Mitchell, Caceres and Zazzera were social workers and/or unlicensed persons who purported to provide many of the Fraudulent Services that were billed to GEICO through SSP.

20.     Defendant Mickaelle Dougherty, Ph.D ("Dougherty") resides in and is a citizen of New York.  At all relevant times, Doughtery was a registered clinical psychologist who purported to provide many of the Fraudulent Services that were billed to GEICO through SSP.

21.     Palmer, Mitchell, Caceres and Dougherty are no strangers to this type of fraudulent no-fault insurance scheme. They are defendants in a lawsuit currently pending in the Eastern District of New York (Docket No.: 1:22-cv-02860-ARR-MMH) involving a clinical psychologist by the name of Karin Gepp, involving a fraudulent scheme to bill GEICO for more than $1.3 million in fraudulent psychological services during the same timeframe period.

22.     Mitchell was also directly involved in a related scheme involving a clinical psychologist by the name of Dianna Bruno, whose identity, license and sole proprietorship were misappropriated by laypersons and wrongfully used to bill GEICO for more than $1 million in fraudulent psychological services during the same timeframe.

23.     The John Doe Defendants are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Stallings, SSP, Grody, Oliver and the Social Worker Defendants.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

25.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

26.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

28.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

29.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)

(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

30.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

31.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

32.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

33.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

34.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

35.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

36.     Unlicensed non-psychologists may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

37.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

38.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

39.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

40.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed practitioners may practice their profession in New York because of the concern that unlicensed persons are not bound by "ethical rules" that govern the quality of care.

41.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or

his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

42.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

43.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

44.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

45.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

46.     Beginning in 2021 and continuing through the present, the Defendants masterminded and implemented a complex fraudulent scheme in which SSP was used to bill GEICO more than $987,000.00 for unnecessary, illusory, and otherwise non-reimbursable psychology services, all in a period of approximately seven (7) months, between July 19, 2021 and February 28, 2022.  In a "quick hit" fashion, the use of SSP was abandoned in February of 2022, after millions of dollars were billed to GEICO and other New York automobile insurers.

### A.     Grody's Solicitation and Employment of the Social Worker Defendants

47.     In or about 2021, Grody, with the assistance of others, including the John Doe Defendants, devised a complex fraudulent scheme whereby the fraudulent psychological services would be provided to every patient who treated at a particular Clinic following an automobile accident.

48.     As part of Grody's scheme, Grody and the John Doe Defendants coordinated with Stallings to permit the use of his name, license, psychology practice (SSP), and SSP's tax identification number to bill GEICO and other New York automobile insurers for the Fraudulent Services.

49.     Grody, Stallings, and the John Doe Defendants knew that to obtain as much No-Fault Benefits as possible, they needed the assistance of others who would meet with and purport to provide psychological services to the automobile accident victims, which would then be billed to GEICO and other New York automobile insurers in the name of Stallings using the name of SSP.

50.     Grody placed online advertisements purporting to seek licensed MSWs and MSW candidates in need of supervised clinical social work hours to obtain their license as a social

worker. The licensed MSWs and MSW candidates would be used by Grody and the John Doe Defendants to provide Insureds with the Fraudulent Services, which would then be billed as though it were performed by licensed psychologists, including Stallings.

51.     Through these online advertisements, Grody hired each of the Social Worker Defendants and Dougherty.  The Social Worker Defendants and Dougherty were informed by Grody that they would be employed and paid by him, but supervised by a psychologist, such as Stallings. Once Grody assembled a group of individuals, he then assigned each Social Worker Defendant and Dougherty a schedule to work at different locations on a rotating basis and provided each of them with template psychological reports, notes, and checklists to conduct purported psychological treatment with the Insureds.

52.     Grody and the John Doe Defendants, with the knowledge and consent of Stallings, used Stallings's name, license number, and the tax identification number of SSP to bill for Fraudulent Services that were performed by the Social Worker Defendants and Dougherty, to the extent they were ever performed at all.

53.     Dougherty and the Social Workers Defendants knew that the Fraudulent Services they performed, which were being billed to New York automobile insurers for No-Fault Benefits, were not lawful because: (i) they were employed by Grody, who is not a licensed psychologist; (ii) they were paid by Grody, directly and/or through Oliver; and (iii) they were purportedly supervised by various psychologists when, in fact, the psychologists never actually performed any supervision over the services provided by Dougherty and the Social Worker Defendants.

54.     In keeping with the fact Doughty and the Social Worker Defendants knew that they were never actually supervised by the psychologists, Doughty and the Social Worker Defendants were purportedly supervised by multiple psychologists when they performed the Fraudulent

Services but were never actually supervised. The Fraudulent Services performed by Doughty and the Social Worker Defendants were then billed to GEICO through different psychological providers.  For example:

    (i)      Doughty performed Fraudulent Services that were billed to GEICO: (i) by Stallings, through SSP; (ii) by Karin Gepp, Ph.D ("Gepp") through Gepp's Sole Proprietorship and Gepp Psychological Services, P.C. (collectively, "the Gepp Entities"); and (iii) by Susan J. Polino, Ph.D ("Polino") through Polino's Sole Proprietorship;

    (ii)     Palmer performed Fraudulent Services that were billed to GEICO: (i) by Stallings through SSP; and (ii) by Gepp through the Gepp Entities;

    (iii)    Caceres performed Fraudulent Services that were billed to GEICO: (i) by Stallings through SSP; and (ii) by Gepp through the Gepp Entities; and

    (iv)    Mitchell performed Fraudulent Services that were billed to GEICO: (i) by Stallings through SSP; and (ii) by Dr. Dianna Bruno ("Bruno") through Bruno's Sole Proprietorship and/or Bruno Psychological Services, P.C. (collectively the "Bruno Entities").

    55.     In keeping with the fact that the Social Worker Defendants and Dougherty were employed by Grody – not Stallings or any of the other psychologists who purported to supervise them – and aided Grody with the fraudulent scheme herein, Grody paid the Social Worker Defendants and Dougherty through Oliver.  Neither the Social Worker Defendants nor Dougherty were ever paid by Stallings or SSP.  Below are representative examples of the checks signed by Grody and issued to the Social Worker Defendants and Dougherty through Oliver:

**Palmer**



**Mitchell**



**Caceres**

**Zazzera**

### B.    Gaining Access to Insureds

56.    SSP has never had any legitimate indicia.  It has never had any fixed treatment locations of any kind, has never maintained a stand-alone practice, has never been the owner or leaseholder in the real property from which it purported to provide psychological services, has never employed its own support staff, and has never advertised or marketed its services to the general public.

16

57.    Rather, access to Insureds was obtained through the payment of kickbacks or other financial incentives to the owners/operators of more than twenty (20) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics").  These Clinics include, but are not limited to, the following locations:

| Clinic Location | Borough/City | State |
|---|---|---|
| 3520 Westchester Avenue | Bronx | NY |
| 204-12 Hillside Avenue | Hollis | NY |
| 8925 130th Street | Richmond Hill | NY |
| 245 Rockway Avenue | Brooklyn | NY |
| 79-45 Metropolitan Avenue | Flushing | NY |
| 105-10 Flatlands Avenue | Brooklyn | NY |
| 332 East 149th Street | Bronx | NY |
| 111-18 Flatlands Avenue | Brooklyn | NY |
| 2184 Flatbush Avenue | Brooklyn | NY |
| 6269 99th Street | Rego Park | NY |
| 2488 Grand Concourse | Bronx | NY |
| 1122 Coney Island Avenue | Brooklyn | NY |
| 55 East 115th Street | New York | NY |
| 1894 Eastchester Road | Bronx | NY |
| 3041 Avenue U | Brooklyn | NY |
| 1735 Pitkin Avenue | Brooklyn | NY |
| 409 Rockway Avenue | Brooklyn | NY |
| 90-16 Sutphin Boulevard | Jamaica | NY |
| 222-01 Hempstead Avenue | Queens Village | NY |
| 4014 Boston Road | Bronx | NY |
| 10510 Flatlands Avenue | Brooklyn | NY |
| 26736 Atlantic Avenue | Brooklyn | NY |
| 647 Bryant Avenue | Bronx | NY |
| 102-28 Jamaica Avenue | Jamaica | NY |
| 1674 East 22nd Street | Bronx | NY |

58.    Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics were, in actuality, organized to supply convenient, one-stop shops for no-fault insurance fraud.

59.     The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

60.     GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

61.     In fact, many of the Clinics identified in this Complaint are the same locations and involved the same licensed MSWs and MSW candidates where other insurance fraud schemes took place during the same time period, involving similar fraudulent treatment and billing schemes pertaining to psychological services, including:

> (i)     the misappropriation of the license, name and sole proprietorship of Bruno;
>
> (ii)    a fraudulent billing and treatment scheme involving the Gepp Entities and their purported owner, Gepp;
>
> (iii)   a fraudulent billing and treatment scheme involving MW Psychology, P.C. ("MW Psych"), MWaldman Corporation ("MWaldman Corp"), and their purported owner, Mel Waldman, Ph.D ("Waldman");
>
> (iv)    a fraudulent billing and treatment scheme involving Lynn Curcuro Consulting LTD ("LCC") and its purported owner Lynn Tenenbaum, Ph.D ("Tenenbaum"); and
>
> (v)     a fraudulent billing and treatment scheme involving Polino and Polino's Sole Proprietorship.

62.     Grody, Oliver, Dougherty, the Social Worker Defendants, and the John Doe Defendants changed "providers" at a Clinic without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system, which is evidenced through the fact that Insureds who purportedly received treatment from SSP also received treatment from other purported psychological providers.

63.     For example, an Insured named KS was involved in an automobile accident on July 14, 2021, and began receiving treatment at a Clinic located at 26736 Atlantic Avenue, Brooklyn, New York (the "Atlantic Avenue Clinic") from Gepp and Gepp Psych.

64.     After the Defendants billed GEICO in the name of Gepp Psych on behalf of KS for purported psychological testing and psychotherapy at the Atlantic Avenue Clinic, GEICO began receiving billing in the name of SSP on behalf of KS, again for purported psychological testing and psychotherapy provided at the Atlantic Avenue Clinic.

65.     Furthermore, the "notes" form associated with the purported psychotherapy sessions that KS received from Gepp Psych and SSP were virtually identical, other than the handwritten name of the respective provider.

66.     Below are representative examples of the "notes" submitted to GEICO from the Defendants on behalf of KS from each respective entity:

## Gepp Psych

08 06 21

Patients Name: [redacted]
DOB: [redacted]
POS: ☐ 2673 Atlantic Ave

Date: 7/19/2021
DOA: 6/22/2021

90801 - 95101 -
96120 - 90836 -
90791 - 96118 -
90806 - 97127/90515 -
96116 - 96105 -
90834 - 1

Type of accident: ☐ MVC, ☒ NF, ☐ Slip/Fall ☐ Other

Patient's Current Functioning (0-10):

Symptom status: ☒ Headaches; ☒ Dizziness; ☒ Pain; ☒ Insomnia; ☒ Fatigue; ☐ Blurred Vision; ☐ Tremors; ☒ Paresis; ☐ Balance; ☒ Appetite ☒ Anxiety; ☐ Depression; ☒ Panic attacks; ☐ Aggression; ☐ Withdrawal; ☐ Suicidal ideation; ☐ Hypervigilance; ☐ Avoidance; ☒ Anger; ☒ Agitation; ☐ Grief; ☒ Flashbacks; ☐ Hallucinations; ☐ Delusions

☐ Attention/Concentration; ☐ Memory; ☐ Word Finding Difficulties; ☐ Disorientation

| Pt. Improved ☐ | Pt Worsened ☐ | No Changes Reported ☒ |
|---|---|---|

| | | |
|---|---|---|
| Support | Examined the evidence | Elicited activity scheduling |
| Biofeedback | Conducted hypnotherapy | / Provided educational materials (audio, reading) |
| / Trained in relaxation | Engaged in parent counseling | Trained in distraction training/attention refocusing |
| / Therapeutic imagery | Taught coping techniques | Assisted in contingency management |
| Assisted in identifying and releasing of affect | Rehearsed co in techniques | Encouraged habit modification |
| Educated in decision making and problem solving | Utilized cognitive restructuring | Provided tips about mood control |
| Assisted in emotional reprocessing | Provided assertiveness training | Provided mood elevation strategies |
| Trained in graded exposure in (in vivo/imagined) | Taught thought stopping | Cognitive testing/other psychological/neuropsychological testing |
| Monitored gains | Reinforcing past gains | Discussed blocks in progress |
| Trained in memory loss coping strategies | Develop therapeutic alliance | cognitive rehabilitation |
| Aided in development of list of environmental stress triggers | Taught conflict resolution | Enhanced self-control |

SUMMARY OF SESSION:
[redacted] came to the clinic, he was engaged in today's session. Clinician provided psychoedu in Reference to patient's diagnosis. Patient was introduced to trained Relaxation and therapeutic imagery. Patient reported symptoms of back pain, headache, dizziness, insomnia, fatigue, anxiety, panic attacks and flashbacks. Patient

08 06 21

has family and gets adequate support from family.

DIAGNOSIS:

| | | | |
|---|---|---|---|
| Anxiety Disorder NOS | ☐ F41.9 | ADHD | ☐ F90.0 |
| | | ASD | ☐ F84.0 |
| | | LD | ☐ F81.9 |
| Depression | ☒ F32.0 | Possible Dementia | ☐ F02.80 |
| Acute Stress Disorder | ☒ F43.0 | Cognitive Disorder NOS | ☐ G31.84 |
| Post-Traumatic Stress | ☒ F43.10 | Post-Concussion Syndrome | ☐ F07.81 |
| Bipolar Disorder | ☐ F31.10 | Seizure Disorder | ☐ F44.5 |
| Personality Disorder | ☐ F60.9 | MS | ☐ G35 |
| Obesity | ☐ E66.9 | Dementia due to Parkinson | ☐ G31.83 |
| Schizophrenia | ☐ F20.0 | Post Stroke | ☐ Z82.3 |
| Impulse Control Disorder | ☐ F63.9 | Chronic Pain | ☐ G89.21 |
| Problems with relationships | ☐ Z63.0 | Pain Disorder with Related Psychological Factors | ☐ F45.42 |
| Possible addiction | ☐ Z63.72 | Adjustment Disorder | ☐ F43.23 |

LEVEL OF DISABILITY: ☐ Total (100%) ☒ Marked (75%) ☐ Moderate (50%) ☐ Mild (25%)
☐ Permanent: ☒ Temporary:

WORK STATUS RECOMMENDATIONS: ☒ Not-Working ☐ Working: ☐ Full-Time, ☐ Part-Time

Continue psychotherapy sessions once a week.

Dr.: KARIN GEPP

## SSP

12 17 21

Patients Name: [redacted]
DOB: [redacted]
POS: ☐ 2673 Atlantic Ave

Date: 11/15/2021
DOA: 6/22/2021

90801 - 95101 -
96120 - 90836 -
90791 - 96118 -
90806 - 97127/90515 -
96116 - 96105 -
90834 - 1

Type of accident: ☐ MVC, ☒ NF, ☐ Slip/Fall ☐ Other

Patient's Current Functioning (0-10):

Symptom status: ☒ Headaches; ☒ Dizziness; ☒ Pain; ☒ Insomnia; ☒ Fatigue; ☐ Blurred Vision; ☐ Tremors; ☒ Paresis; ☐ Balance; ☒ Appetite ☒ Anxiety; ☒ Depression; ☒ Panic attacks; ☐ Aggression; ☐ Withdrawal; ☐ Suicidal ideation; ☐ Hypervigilance; ☐ Avoidance; ☒ Anger; ☒ Agitation; ☐ Grief; ☒ Flashbacks; ☐ Hallucinations; ☐ Delusions

☐ Attention/Concentration; ☐ Memory; ☐ Word Finding Difficulties; ☐ Disorientation

| Pt. Improved ☐ | Pt Worsened ☐ | No Changes Reported ☒ |
|---|---|---|

| | | |
|---|---|---|
| Support | Examined the evidence | Elicited activity scheduling |
| Biofeedback | Conducted hypnotherapy | / Provided educational materials (audio, reading) |
| / Trained in relaxation | Engaged in parent counseling | Trained in distraction training/attention refocusing |
| / Therapeutic imagery | Taught coping techniques | Assisted in contingency management |
| Assisted in identifying and releasing of affect | Rehearsed co in techniques | Encouraged habit modification |
| Educated in decision making and problem solving | Utilized cognitive restructuring | / Provided tips about mood control |
| Assisted in emotional reprocessing | Provided assertiveness training | Provided mood elevation strategies |
| Trained in graded exposure in (in vivo/imagined) | Taught thought stopping | Cognitive testing/other psychological/neuropsychological testing |
| Monitored gains | Reinforcing past gains | Discussed blocks in progress |
| Trained in memory loss coping strategies | Develop therapeutic alliance | cognitive rehabilitation |
| Aided in development of list of environmental stress triggers | Taught conflict resolution | Enhanced self-control |

SUMMARY OF SESSION:
[redacted] came to the clinic, he was engaged in today's session. Clinician provided psycho edu in Reference to patient diagnosis. Patient Reported ongoing symptoms of back pain, headache, dizziness, fatigue, anxiety, depression and flashbacks. Patient Reported his goal is to be pain free.

12 17 21

Patient has family and gets adequate social and emotional support.

DIAGNOSIS:

| | | | |
|---|---|---|---|
| Anxiety Disorder NOS | ☐ F41.9 | ADHD | ☐ F90.0 |
| | | ASD | ☐ F84.0 |
| | | LD | ☐ F81.9 |
| Depression | ☒ F32.0 | Possible Dementia | ☐ F02.80 |
| Acute Stress Disorder | ☐ F43.0 | Cognitive Disorder NOS | ☐ G31.84 |
| Post-Traumatic Stress | ☐ F43.10 | Post-Concussion Syndrome | ☐ F07.81 |
| Bipolar Disorder | ☐ F31.10 | Seizure Disorder | ☐ F44.5 |
| Personality Disorder | ☐ F60.9 | MS | ☐ G35 |
| Obesity | ☐ E66.9 | Dementia due to Parkinson | ☐ G31.83 |
| Schizophrenia | ☐ F20.0 | Post Stroke | ☐ Z82.3 |
| Impulse Control Disorder | ☐ F63.9 | Chronic Pain | ☐ G89.21 |
| Problems with relationships | ☐ Z63.0 | Pain Disorder with Related Psychological Factors | ☒ F45.42 |
| Possible addiction | ☐ Z63.72 | Adjustment Disorder | ☐ F43.23 |

LEVEL OF DISABILITY: ☐ Total (100%) ☒ Marked (75%) ☐ Moderate (50%) ☐ Mild (25%)
☐ Permanent: ☒ Temporary:

WORK STATUS RECOMMENDATIONS: ☐ Not-Working ☐ Working: ☒ Full-Time, ☐ Part-Time

Continue psychotherapy sessions once a week.

Dr.: Kouato Stallings

67.     GEICO also received billing for purported healthcare services from SSP at the following locations, each of which contained an ever-changing number of fraudulent healthcare providers:

(i)     The Clinic located at 3250 Westchester Avenue, Bronx, New York, was a revolving door of more than 130 purportedly different healthcare providers;

(ii)    The Clinic located at 1894 Eastchester Road, Bronx, New York, was a revolving door of more than 90 purportedly different healthcare providers; and

(iii)   The Clinic located a 90-16 Sutphin Boulevard, Jamaica, New York, was a revolving door of more than 90 purportedly different healthcare providers.

68.     The John Doe Defendants who operated and controlled the Clinics willingly provided access to Stallings, SSP, Grody, and Oliver in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to high volumes of Insureds at the locations.

69.      In general, the referral sources at the Clinics, including the John Doe Defendants were paid a sum of money by Grody, Oliver and the other John Doe Defendants as part of a "pay-to-play" arrangement.  Although the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals and access to Insureds.  In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to Stallings, Palmer, Mitchell, Caceres, Zazzera and/or Dougherty, or some other mental health practitioner allegedly associated with SSP (collectively the "Practitioner Defendants"), who was purportedly present at the Clinic at that time, for psychological evaluation

and testing, regardless of individual symptoms, presentation or, in most cases, the total absence of any clinically significant psychological symptoms arising from any automobile accident.

70.     In keeping with the fact that the Clinics provided access to patients in exchange for kickbacks and other financial incentives, three of the Clinics where the Defendants purportedly provided Fraudulent Services to Insureds: (i) the Clinic located 105-10 Flatlands Avenue, Brooklyn, New York; (ii) the Clinic located at 204-12 Hillside Avenue, Hollis, New York; and (iii) the Clinic located at 332 East 149th Street, Bronx, New York, are locations that have been the subject of a recent indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(SDNY 2019).

71.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the Practitioner Defendants, who were given access to the Clinics' offices on a transient basis pursuant to the payments made by Grody, Oliver, and the John Doe Defendants to the Clinics and/or referral sources.

72.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Clinics and the referral sources, because, without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

73.     Stallings, Grody and the John Doe Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.  In fact, Grody, Oliver and the John Doe Defendants operated SSP for only a short period of time in an effort to try and limit the billing for the Fraudulent Services submitted to GEICO by SSP to "stay under the radar" of GEICO and other New York automobile insurers.

### C.     The Fraudulent Treatment and Billing Protocol

74.     Every Insured who was seen by the Practitioner Defendants was subjected to a psychiatric evaluation, as well as to a virtually identical series of unnecessary psychological testing and services that were provided pursuant to a predetermined protocol.

75.     The Clinic "representatives" providing access and/or making the referrals were unlicensed individuals.  Each step in the "treatment" protocol was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing for each Insured.

76.     In fact, the battery of unnecessary psychological evaluation and psychological tests more fully described below which were purportedly performed resulted in more than $987,000.00 in billing to GEICO in approximately seven (7) months.

### i.     The Fraudulent Pre-Determined Treatment Protocol

77.     When an Insured was referred to the Practitioner Defendants pursuant to the unlawful referral arrangement, SSP would systemically bill for the same combination of CPT codes, adjusted by falsely using a 1-B modifier to further inflate the charges for the Fraudulent Services, with the following descriptions and charges:

> (i)     "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73;

(ii)　"psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48;

(iii)　"neurobehavioral status exam by physician" using CPT code 96117-1B (1 unit), with a charge of $324.07; and

(iv)　"neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.

78.　More specifically, the referral of an Insured to the Practitioner Defendants would typically result in an initial series of charges to GEICO through SSP of more than $2,400.00 per Insured based on the Fraudulent Services.

79.　Despite the purported symptoms or lack of symptoms noted for each Insured and their diagnosis, virtually every patient received the same treatment. For example:

(i)　On May 4, 2021, an Insured named VH was involved in an automobile accident. VH then purportedly underwent an initial evaluation with Mitchell at the Clinic located at 204-12 Hillside Avenue, Hollis, New York (the "Hillside Avenue Clinic"). The notes from the purported evaluation indicate that VH reported her symptoms to include: "sadness/depression, anxiety, impatience, irritability, elevated mood, flashbacks." Mitchell then purportedly diagnosed VH with "post-traumatic stress" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(ii)　On June 26, 2021, an Insured named KP was involved in an automobile accident. KP then purportedly underwent an initial evaluation with Caceres at the Clinic located at 3250 Westchester Avenue, Bronx, New York (the "Westchester Avenue Clinic"). The notes from the purported evaluation indicate that KP reported her symptoms to include "anxiousness, worried, difficulty thinking clearly, difficulty concentrating". Caceres then purportedly diagnosed KP with "adjustment disorder with anxiety" and recommended the following treatment: "three months of Supportive

Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iii)   On July 10, 2021, an Insured named TM was involved in an automobile accident. TM then purportedly underwent an initial evaluation with Mitchell at the Clinic located at 3925 130th Street, Richmond Hill, New York (the "130th Street Clinic"). The notes from the purported evaluation indicate that TM did not report any cognitive or emotional symptoms. Despite this, Mitchell purportedly diagnosed TM with "pain disorder with psychological factors", and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iv)   On July 20, 2021, an Insured named MM was involved in an automobile accident. MM then purportedly underwent an initial evaluation with Zazzera at the Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York (the "Sutphin Boulevard Clinic"). The notes from the purported evaluation indicate that MM reported her symptoms to include "anxiousness". Zazzera then purportedly diagnosed MM with "pain disorder with psychological factors" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii)

"neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(v)     On July 21, 2021, an Insured named JD was involved in an automobile accident. JD then purportedly underwent an initial evaluation with Caceres at the Clinic located at 332 East 149th Street, Bronx, New York (the "East 149th Street Clinic"). The notes from the purported evaluation indicate that JD reported her symptoms to include "anxiousness, difficulty concentrating, difficulty thinking clearly." Caceres then purportedly diagnosed JD with "post-traumatic stress disorder, acute" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

(vi)     On July 21, 2021, an Insured named LD was involved in an automobile accident. LD then purportedly underwent an initial evaluation with Mitchell at the Clinic located at 222-01 Hempstead Avenue, Queens Village, New York (the "Hempstead Avenue Clinic"). The notes from the purported evaluation indicate that LD reported no emotional or cognitive symptoms. Despite this, Mitchell purportedly diagnosed LD with "pain disorder with psychological factors" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

(vii)     On July 24, 2021, an Insured named CP was involved in an automobile accident. CP then purportedly underwent an initial evaluation with Wells at the Clinic located at 55 East 115th Street, New York, New York (the "East

115th Street Clinic"). The notes from the purported evaluation indicate that CP reported her symptoms to include "depressed mood, irritability, decreased energy, grief and loss, anxiousness, sexual problems, problems controlling temper, flashbacks." Wells then purportedly diagnosed CP with "acute stress disorder" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(viii)    On July 28, 2021, an Insured named TH was involved in an automobile accident. TH then purportedly underwent an initial evaluation with Mitchell at the Clinic located at 3041 Avenue U, Brooklyn, New York (the "Avenue U Clinic"). The notes from the purported evaluation indicate that TH reported her symptoms to include "flashbacks". Mitchell then purportedly diagnosed TH with "pain disorder with psychological factors" and recommended the following treatment: "Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with her disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

(ix)    On July 29, 2021, an Insured named ST was involved in an automobile accident. ST then purportedly underwent an initial evaluation with Mitchell at the Clinic located at 1894 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic"). The notes from the purported evaluation indicate that ST reported his symptoms to include "panic attacks, flashbacks". Mitchell then purportedly diagnosed ST with "acute stress disorder" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided

by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(x)     On August 3, 2021, an Insured named LA was involved in an automobile accident. LA then purportedly underwent an initial evaluation with Caceres at the Sutphin Boulevard Clinic. The notes from the purported evaluation indicate that LA did not report any emotional or cognitive symptoms. Despite this, Caceres purportedly diagnosed LA with "pain disorder with psychological factors" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(xi)    On August 5, 2021, an Insured named OR was involved in an automobile accident. OR then purportedly underwent an initial evaluation with Caceres at the Westchester Avenue Clinic. The notes from the purported evaluation indicate that OR did not report any emotional or cognitive symptoms. Despite this, Caceres purportedly diagnosed OR with "pain disorder with psychological factors" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

(xii)   On August 5, 2021, an Insured named JE was involved in an automobile accident. JE then purportedly underwent an initial evaluation with Caceres

at the Clinic located at 2488 Grand Concourse, Bronx, New York (the "Grand Concourse Clinic"). The notes from the purported evaluation indicate that JE reported no emotional or cognitive symptoms. Despite this, Caceres purportedly diagnosed JE with "adjustment disorder with anxiety" and and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(xiii)  On August 9, 2021, an Insured named AH was involved in an automobile accident. AH then purportedly underwent an initial evaluation with Wells at the Clinic located at 4014 Boston Road, Bronx, New York (the "Boston Road Clinic"). The notes from the purported evaluation indicate that AH reported symptoms to include "depressed mood, irritability, hopelessness, decreased energy, anxiousness, sexual problems, problem controlling temper, problems at home, learning problems, flashbacks." Wells then purportedly diagnosed AH with "acute stress disorder" and recommended the following treatment: "three months of Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."; and

(xiv)  On August 16, 2021, an Insured named VL was involved in an automobile accident. VL then purportedly underwent an initial evaluation with Caceres at the Atlantic Avenue Clinic. The notes from the purported evaluation indicate that VL reported symptoms to include "anxiousness, worries, difficulty thinking clearly, difficulty concentrating, sleeping problems." Caceres then purportedly diagnosed VL with "adjustment disorder with anxiety" and recommended the following treatment: "three months of

Supportive Psychotherapy through Cognitive Behavior Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with his disability and regulate pain levels." After this purported evaluation, a bill was submitted to GEICO under SSP, for services purportedly provided by Stallings, for the following: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

80.     These are just representative examples.

81.     In keeping with the fact that the pre-determined treatment protocol was used to fraudulently bill GEICO for treatment and testing that was either unnecessary or never occurred, on multiple occasions, Insureds who were purportedly involved in the same motor vehicle accident received the same treatment and recommendations, regardless of their reported symptoms and diagnosis.  For example:

(i)     On May 3, 2021, two Insureds – JD and VD – were involved in the same automobile accident. Thereafter, JD and VD both presented to the Eastchester Road Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both JD and VD from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(ii)    On May 11, 2021, two Insureds – GM and ZM – were involved in the same automobile accident. Thereafter, GM and ZM both presented to the Westchester Avenue Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both GM and ZM from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of

$324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iii)   On June 26, 2021, two Insureds – TB and MK – were involved in an automobile accident. Thereafter, TB and MK both presented to the Clinic located at 105-10 Flatlands Avenue, Brooklyn, New York (the "Flatlands Avenue Clinic") and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both TB and MK from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iv)   On July 9, 2021, two Insureds – DL and MP – were involved in an automobile accident. Thereafter, DL and MP both presented to the Clinic located at 102-28 Jamaica Avenue, Richmond Hill, New York (the "Jamaica Avenue Clinic") and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both DL and MP from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(v)   On July 11, 2021, two Insureds – AC and AR – were involved in an automobile accident. Thereafter, AC and AR both presented to the Grand Concourse Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both AC and AR from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(vi)   On August 5, 2021, two Insureds – NF and DS – were involved in an automobile accident. Thereafter, NF and DS both presented to the Clinic located the Sutphin Boulevard Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both NF and DS from SSP with the following charges:

(i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(vii)   On August 31, 2021, three Insureds – LA, RE and SE – were involved in an automobile accident. Thereafter, LA, RE and SE each presented to the Clinic located at 1735 Pitkin Avenue, Brooklyn, New York (the "Pitkin Avenue Clinic") and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for LA, RE, and SE from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(viii)   On September 13, 2021, two Insureds – RG and TH – were involved in an automobile accident. Thereafter, RG and TH both presented to the East 149th Street Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both RG and TH from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(ix)   On October 15, 2021, two Insureds – RM and KW – were involved in an automobile accident. Thereafter, RM and KW both presented to the Avenue U Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both RM and KW from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."; and

(x)     On October 22, 2021, two Insureds – OC and CV – were involved in an automobile accident. Thereafter, OC and CV both presented to the Boston Road Clinic, and each purportedly underwent psychological testing through SSP by Stallings. Thereafter, GEICO received billing for both OC and CV from SSP with the following charges: (i) "psychiatric diagnostic evaluation" using CPT code 90305-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

82.     These are just representative examples.

### ii.     The Fraudulent Diagnostic Interview Examinations and Charges

83.     Once an Insured was referred to one of the Practitioner Defendants or some other individual associated with SSP pursuant to the unlawful referral arrangements, the Practitioner Defendants or other mental health practitioners initially purported to conduct a diagnostic evaluation.

84.     The diagnostic evaluation was then billed to GEICO in the name of SSP using CPT code 90791-1B and a resulting charge of $305.73.

85.     The diagnostic interview examinations performed, to the extent performed at all, were fraudulent because: they were (i) psychologically unnecessary; (ii) conducted pursuant to the improper financial arrangements between the Defendants and the Clinics and not pursuant to the documented and clinically reasonable needs of the Insureds; and (iii) purportedly conducted by Stallings, which virtually never actually happened.

86.     In addition, in the claims for diagnostic evaluations identified in Exhibit "1", the bills and supporting documents falsely represented that they were legitimately performed in the first instance.

### a.      Basic, Legitimate Psychiatric Diagnostic Evaluations

87.      A psychiatric diagnostic evaluation is an integrated assessment in which mental health practitioners elicit patient data and then use that data to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for that patient.

88.      In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to derive a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for a patient, is elicited through a clinical interview and a mental status examination.

89.      The clinical interview is a face-to-face encounter between the mental health practitioner and the patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychiatric history, family history, and social history.

90.      The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, motor and speech activity, mood and affect, thought and perception, attitude, insight and judgment, orientation, attention, concentration and other cognitive areas.  Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

91.      In non-complex cases, a psychiatric diagnostic evaluation consisting of a clinical interview and a mental status examination will typically elicit patient data sufficient to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan.  In an atypical or complex case, where a mental health practitioner is unable to establish a preliminary diagnosis based on a patient interview and a mental status examination, that mental health practitioner may choose to incorporate simple self-administered or self-scored inventories,

screening tests, or other similar tests as part of the psychiatric diagnostic evaluation.  The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately billable as psychiatric testing.

### b.   The Medically Unnecessary Diagnostic Evaluations

92.   In the claims identified in Exhibit "1", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation would have been medically necessary.

93.   In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychiatric illness and/or is demonstrating emotional or behavioral symptoms that manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden change in behavior.

94.   In keeping with the fact that in the claims identified in Exhibit "1", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident, such that a psychiatric diagnostic evaluation was medically necessary, nearly all of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

95.   For example, in many of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, the Insureds' vehicles were drivable following the accidents, and no one was seriously injured in the underlying accidents or injured at all.  In addition, in the vast majority of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents.

96.     It is highly improbable that these largely trivial "fender-benders", which virtually never resulted in serious physical injury, would have caused clinically significant psychiatric symptoms in any of the Insureds who purportedly experienced them, much less in large volumes of Insureds who happened to show up, without appointments, at one of the Clinics on the same day.

97.     The Practitioner Defendants purported to provide the diagnostic evaluations in order to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychiatric testing".  In fact, the charges that the Practitioner Defendants submitted through SSP for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

98.     Legitimate clinical interviews and mental status examinations were never actually performed and the Practitioner Defendants simply used a series of "templated" questionnaires and forms that were limited in scope, not intended to have any legitimate benefit for the Insureds that were subjected to them, and conducted in order to establish a basis for the additional Fraudulent Services to which the Practitioner Defendants purported to subject the Insureds, including "psychiatric testing", as well as to establish a basis for other medically unnecessary healthcare services that the referral sources could purport to provide to the Insureds.

99.     Irrespective of any data elicited through the putative clinical interview and mental status examination of a particular Insured, the diagnostic examination reports submitted in support of the billing for virtually every Insured always reported a boilerplate "diagnosis" as the result of emotional and behavioral problems incurred as a result of an automobile accident. Additionally, virtually every diagnostic interview examination report submitted to GEICO by the Defendants contained language that was duplicated across all other reports.  Only the Insureds' respective

background information was unique to any particular patient.   In almost every case, the "Recommendations" section consisted of boilerplate language that simply was cut-and-pasted between reports, typically reaching the following conclusions:

> **Recommendations**: (Name of Insured) should receive three months of Supporting Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with (his/her) disability and regulate pain levels"

> **Recommendations:** Supportive psychotherapy through cognitive-behavioral therapy and/or biofeedback. Treatment should be provided at least once a week to cope with her disability and regulate pain levels.

(A representative sample of the Defendants' diagnostic interview examination "reports" containing this identical, boilerplate language is annexed hereto as Exhibit "2").

100.    Further, irrespective of any data elicited through the purported clinical interview and mental status examination of any particular Insured, the diagnostic examination reports submitted in support of the billing contain largely the same diagnoses.  For example, over fifty two (52%) percent of the Insureds allegedly seen by the Practitioner Defendants were diagnosed with "Pain Disorder with Psychological Factors" (ICD-10 F.45.34), which is a clinical impossibility.

101.    In generating the reports, the Practitioner Defendants drew from a "stock" of language that they randomly assembled and combined with the Insureds' claim information to create the fake impression that the "psychiatric diagnostic evaluation" was actually and properly performed.  Across multiple reports, Insureds purportedly described their respective automobile accidents using the exact same language, such as feeling "shocked due to adrenaline."  In fact, these interviews were either not performed at all, or were not meant to have any legitimate benefit for the Insureds that were subjected to them and were only conducted for the financial benefit of the Defendants.  Not only did the Defendants submit improper billing for the psychiatric diagnostic

evaluations, they also "unbundled" the charges in virtually every instance in order to maximize the billing they could submit, or cause to be submitted, to GEICO.

### iii.    The Fraudulent "Psychological Testing" Charges

102.    On the same day that Insureds in the claims identified in Exhibit "1" were purportedly subjected to a diagnostic evaluation, the Practitioner Defendants purported to provide those same Insureds with a battery of needless psychological tests.

103.    The purported psychological testing was then billed to GEICO in the following manner: four (4) hours of psychological testing performed by a psychologist using CPT code 96101-1B, two (2) hours of neuropsychological testing using CPT code 96118-1B, and one (1) hour of neurobehavioral status examination using CPT code 96116-1B, virtually always resulting in a total charge of $2,490.50 per Insured for seven (7) hours of testing.

104.    The psychological testing was unnecessary, and conducted, to the extent it was conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

105.    In keeping with the fact that the "psychiatric testing" was medically and psychologically unnecessary, the vast majority of Insureds did not suffer from any clinically significant psychiatric symptoms as a result of their largely minor "fender benders".  Even if any of the Insureds did suffer clinically significant psychiatric symptoms as a result of putative accidents, which they did not, in a legitimate clinical setting, the diagnostic evaluation would typically be the only service necessary to formulate a diagnosis and treatment plan for individual Insureds in non-complex psychological cases.

106.    Psychological testing is only indicated in complex psychological cases, and only where the particular testing administered is intended to augment the findings from the initial

clinical interview and mental status examination and to clarify a differential diagnosis.  In fact, the fraudulent testing protocol employed by the Defendants here is contrary to the New York Workers Compensation, Behavioral Health Fee Schedule (the "Fee Schedule") ground rules, which specifically states that "Psychological Tests should not be used routinely".

107.    In the claims for "psychiatric testing" identified in Exhibits "1", none of the Insureds who purportedly were subjected to "psychiatric testing" by the Practitioner Defendants presented with complex psychiatric symptoms.

108.    Rather, each Insured, to the extent they suffered any clinically significant psychiatric symptoms at all as a result of a putative automobile accident, experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the alleged psychiatric symptoms in response to the accident.  In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

109.    Furthermore, even if the Insureds presented to SSP with complex psychiatric symptoms attributable to their minor automobile accidents, which they did not, the "psychiatric testing" that the Practitioner Defendants purported to provide to the Insureds would not have elicited any significant data that could not have been elicited during the clinical interview and mental status examination portions of a legitimate psychiatric diagnostic evaluation.

110.    Furthermore, as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychiatric testing.

111.    In actuality, the tests employed by the Practitioner Defendants were merely a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the unlawful referral relationships.  The Insureds were then invited to check off the psychological symptoms they purportedly were experiencing.  None of the Practitioner Defendants, including Stallings himself, engaged in any independent assessment of any Insured's discrete symptoms or presentation before the Insureds were handed the psychological tests.  The charges for the psychological testing were fraudulent inasmuch as the testing was performed, to the extent it was performed at all, pursuant to a predetermined treatment protocol.

112.    In keeping with the predetermined treatment protocol, an identical battery of psychological tests was provided to virtually every Insured, without regard for their individual circumstances or presentation.  Specifically, in virtually every case where a diagnostic interview was conducted, the Social Worker Defendants purported to provide virtually every Insured with the following psychological tests:

> (i)     Short Blessed Test ("SBT") – a six item questionnaire used to evaluate symptoms of dementia. A SBT typically takes ten to twelve (10-12) minutes to administer;

> (ii)    Beck Anxiety Inventory ("BAI") – a twenty-one question self-report used to evaluate the symptoms of anxiety. A BAI typically takes ten to fifteen (10-15) minutes to administer;

> (iii)   Beck Depression Inventory – II ("BDI") – a twenty-one question self-report used to evaluate the symptoms of depression. A BDI typically takes ten to fifteen (10-15) minutes to administer;

> (iv)    Beck Hopelessness Scale ("BHS") – a set of 10-20 questions that the patient answers true/false to determine their mental state with regards to thought about future, motivation and expectations. A BHS typically takes ten to fifteen (10-15) minutes to administer;

(v)     Pain Disability Index ("PDI") – a two-page self-report or interview used to assess the severity of and the impact of pain on daily functions. A PSI typically takes approximately five (5) minutes to administer; and

(vi)    Posttraumatic Stress Disorder Checklist for DSM-5 ("PCL-5") – a set of twenty self-report questions used to evaluates symptoms of post-traumatic stress disorder. A PCL-5 typically takes approximately five to ten (5-10) minutes to administer.

113.    Furthermore, the Defendants' charges for the psychological testing were fraudulent because, notwithstanding the Defendants' misrepresentations that the tests virtually always took seven (7) hours to perform, the tests generally took no more than a fraction of that reported time to administer, score, and interpret, to the extent they were performed in the first instance.

114.    The Defendants' reports submitted along with charges for the psychological testing routinely misrepresented that the Practitioner Defendants prepared genuine, written reports interpreting the test results.

115.    Specifically, the Defendants' charges for the "psychological testing" were fraudulent in that the use of CPT code 96101 represented that the Defendants prepared a written report interpreting the test results.  Although the Defendants routinely billed for the psychological testing using CPT code 96101-1B, and although the Defendants submitted what they purport to be interpretive test reports in support of their billing, none of the Practitioner Defendants, or any other mental health practitioners associated with SSP, ever prepared any valid written reports interpreting the test results.

116.    Rather, the Practitioner Defendants simply cobbled the psychological testing reports together using boilerplate language from pre-existing reports.  In fact, virtually every psychological testing report submitted by the Defendants in support of SSP's billing contained language that was duplicated across Insureds' reports.  Only the Insureds' respective background information and "test results and interpretation" scores were unique to any particular patient.  In

particular, virtually every psychological testing report resulted in a verbatim recommendation for

psychotherapy, as well as a verbatim description of what the course of psychotherapy would entail:

> <u>Recommendations</u>: (Name of Insured) should receive three months of Supporting Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with (his/her) disability and regulate pain levels"

> A representative sample of the Defendants' fraudulent psychological test reports

containing this identical, boilerplate language is annexed hereto as Exhibit "2".

117.    Virtually every boilerplate "psychological test report" generated by the Practitioner

Defendants concluded with a false, predetermined "diagnosis" as the result of an automobile

accident.

118.    The Practitioner Defendants issued these phony "diagnoses" regardless of the

individual circumstances or unique presentation.

119.    In actuality, the vast majority of Insureds did not suffer from any other legitimate

psychological problems as the result of the minor automobile accidents they supposedly

experienced, and in fact, many were given a diagnosis despite the fact that they reported that they

experienced no symptoms.

120.    None of the Practitioner Defendants, or any other mental health professional ever

legitimately reviewed the results of the psychological testing or legitimately created or altered any

Insured's treatment plan based upon the results of the testing.  As forth above, regardless of any

individual Insureds purported test scores, every Insured received the same boilerplate treatment

plan, and only a small fraction of the Insureds actually received any follow up psychological

treatment and care.

### iv.   The Fraudulent Psychotherapy Charges

121.   Based upon the fraudulent, pre-determined outcome of the "psychiatric testing" and "psychiatric diagnostic evaluations", along with the phony "adjustment", "anxiety", "acute stress", and/or "post-traumatic stress" disorder diagnoses, the Defendants referred virtually every Insured to return to SSP for unnecessary psychotherapy sessions.  Then, one of the Practitioner Defendants, or some other individual associated with SSP, purported to perform the psychotherapy.

122.   These psychotherapy sessions were billed through SSP to GEICO using CPT Code 90834, typically resulting in a charge of $165.94.

123.   Like the Defendants' charges for the "psychiatric diagnostic evaluations" and "psychiatric testing", the charges for the psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent conducted at all, solely pursuant to the kickback arrangements between the Defendants and the Clinics and/or referral sources.  Indeed, as set forth above, virtually every Insured who purportedly was subjected to the psychotherapy did not have any clinically significant psychiatric symptoms arising from their putative automobile accidents.

124.   The Defendants' charges for the psychotherapy sessions also were fraudulent because they represented that the services were reimbursable using CPT Code 90834, which would have required that a licensed mental health practitioner spent 45 minutes with the Insured.  In fact, neither Stallings nor any other mental health practitioner associated with SSP ever spent 45 minutes with the Insureds.  Rather, the psychotherapy sessions virtually never lasted more than 15-20 minutes.

125.   Additionally, the "notes" submitted with the purported psychotherapy session conducted by Stallings virtually always contained a pre-printed recommendation of "continue

psychotherapy sessions once a week" and Stallings' handwritten name on the bottom of the form, in noticeably different handwriting.  The following are representative examples:



        v.       **Fraudulent Misrepresentations Regarding the Identity of the Persons Performing the Fraudulent Services and Billing for Over 24 Hours on a Single Day**

126.    To obtain payment for the Fraudulent Services, Stallings, SSP, Grody and the John Doe Defendants also falsely represented the identities of the mental health professionals who performed the services that were billed to GEICO through SSP.  More specifically, every NF-3 submitted to GEICO intentionally misrepresented that Stallings was the actual provider of the services.

127.     In fact, Stallings virtually never performed or directly supervised the vast majority of the Fraudulent Services that were allegedly provided to GEICO Insureds and billed to GEICO. Rather, virtually all the mental health testing and services that were billed to GEICO were performed by the Social Worker Defendants or other unlicensed individuals without any legitimate supervision or oversight by Stallings or any other licensed psychologist.

128.     Pursuant to New York Education Law §7605 Sect. 3 (13), an individual with a Masters level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."

129.     The Social Worker Defendants were not licensed psychologists, but at best held Masters' level degrees in social work, and some have no such qualifications.  In fact, Palmer, Mitchell, Caceres and Zazzera are not listed as licensed social workers per the New York State Office of Professions.  As a result, the No-Fault Law prohibited SSP from recovering no-fault benefits from the services allegedly performed by the unsupervised Social Worker Defendants.

130.     Stallings, SSP and the John Doe Defendants were well aware of the fact that SSP could not legitimately bill or recover for services provided by unsupervised mental health providers who were not licensed psychologists, such as the Social Worker Defendants.  As such, they falsely listed Stallings as the treating provider on every bill submitted to GEICO, and affixed photocopies of Stallings' signature to both bills and medical notes, to create the false appearance that Stallings either performed or supervised the services purportedly provided.

131.     Stallings, SSP, Grody and the John Doe Defendants billed GEICO for more than 1,600 hours of psychological testing allegedly performed between July 19, 2021 and December 7, 2021 (less than five (5) months), and for more than 24 hours per day on multiple individual days.

132.    The following are representative examples:

| Date of Service | Total Hours of Testing Billed to GEICO |
|---|---|
| 7/20/2021 | 62 hours |
| 7/27/2021 | 48 hours |
| 8/11/2021 | 49 hours |
| 8/16/2021 | 63 hours |
| 8/19/2021 | 43 hours |
| 9/8/2021 | 63 hours |
| 9/14/2021 | 35 hours |
| 9/15/2021 | 50 hours |
| 9/20/2021 | 29 hours |
| 9/21/2021 | 34 hours |

133.    In addition to billing GEICO for over twenty-four (24) hours of testing on a single date, there were multiple days for which SSP submitted bills to GEICO where the services purportedly provided to Insureds exceeded twelve (12) hours by a single Provider Defendant, including the following dates:

| Date of Service | Actual Provider | Hours of Purported Services Billed to GEICO |
|---|---|---|
| 7/20/2021 | Zazzera | 30 hours |
| 8/11/2021 | Caceres | 12 hours |
| 8/11/2021 | Palmer | 12 hours |
| 8/11/2021 | Dougherty | 12 hours |
| 8/16/2021 | Mitchell | 36 hours |
| 8/16/2021 | Caceres | 12 hours |
| 9/8/2021 | Palmer | 35 hours |
| 9/8/2021 | Wells | 21 hours |
| 9/15/2021 | Wells | 18 hours |
| 9/15/2021 | Palmer | 12 hours |
| 9/15/2021 | Mitchell | 12 hours |

134.    Not only would it have been impossible for a single provider to perform over twenty-four hours of services in one day, but it is also impossible that Stallings supervised the Social Worker Defendants who purportedly performed over twenty-four hours of services during a single date.

46

135.    Additionally, SSP billed for additional services allegedly performed by Dougherty, representing that Dougherty purportedly administered "Montreal Cognitive Assessments".  The billing submitted to GEICO misrepresented that the service was performed by Stallings, for four units using CPT code 96116-1B, seeking payment in the amount of $1,296.28.

136.    The billing was also fraudulent beyond the misrepresentations relating to the provider of the service because it was medically unnecessary and performed solely to maximize the charges to GEICO.  In fact, a Montreal Cognitive Assessment would have no application in the context of a motor vehicle accident, since it is a test used to screen for Alzheimer's disease and age-related mental decline.

137.    The reports confirm the fraudulent nature of the testing protocol employed.  Within the billing for the "Montreal Cognitive Assessment", SSP submitted form notes that contained no specific information regarding an Insured's performance on the test other than a score and contained Dougherty's typed name and Stallings' photocopied signature on the bottom of all of the forms.

138.    The below is a representative example:

**Montreal Cognitive Assessment**
Version 7.1

| Name of Patient: | |
|---|---|
| Gender: | Male |
| Date of Birth: | |
| Age | 29 |
| Date of Accident | 6/26/2021 |
| Date of Services | 8/10/2021 |

**Introduction:** The Montreal Cognitive Assessment (MoCA) is a screening instrument for cognitive dysfunction. It assesses the following cognitive domains: attention, concentration, executive functions, memory, language, visual-constructional skills, conceptual thinking, calculations, and orientation. The total possible score is 30 points; a score of 26 or above is considered normal. One point is added if the patient has an education level of 12 years or lower.

**1. Visuospatial/Executive**

**Alternating Trail Making:** This abridged version of Trail Making Test Part B is a test of executive function. This test requires the individual to shift between numbers and letters in ascending order. Assessments of set shifting measure the ability to switch back and forth between concepts, stimuli, or strategies, which require mental flexibility and multitasking in addition to visuomotor and visuoperceptual skills.

**Visuoconstructional Skills (Cube):** This test requires the patient to copy a three-dimensional cube. Visuospatial, visuoperceptual, and visuomotor coordination are tested. This test requires verbal understanding, memory, spatially coded knowledge, and constructive skills. This impairment may include what is referred to as disconnection syndromes in which centers of basic visual sensory functions are dissociated or disconnected from association cortex areas that allow for synthesis or analysis necessary to recognize the sensory stimuli as a specific object.

**Visuoconstructional Skills (Clock):** This test requires the patient to copy a clock. Visuospatial, visuoperceptual, constructional skills, and memory are tested. The patient's performance is observed from beginning to end, and scored based on the shape and size, number order and placement, and proper hand placement to indicate a specific time. The test requires auditory comprehension, verbal understanding, executive control, memory, spatially coded knowledge, and constructive and motor skills.

**2. Naming:** The patient must identify and name three animals from pictures. One point each is given for the correct identification of the following animals: (1) lion (2) rhinoceros or rhino (3) camel or dromedary. If the patient cannot tell both the name and the context, they may have impaired visuoperceptual skills with inability to recognize the animal. If the patient cannot name the animal but can give contextual information about the animal, for example, "It lives in the desert (camel)", this could be suggestive of either word finding difficulty or semantic memory impairment.

**3. Memory:** The patient is given two initial learning trials of a five-words list read at the rate of one per second, giving the following instructions: "This is a memory test. I am going to read a list of words that you will have to remember now and later on."

**4. Attention:**

Forward Digit Span: A sequence of five numbers is read at a rate of one digit per second. The patient is required to repeat the sequence in the correct order. Backward Digit Span: A sequence of three numbers is read at a rate of one digit per second. The patient is required to recite the sequence in the backwards order. Forward Digit Span and Backward Digit Span measure auditory attention and working memory. Backward Digit Span additionally requires a more demanding ability in transforming digits into a reverse order before articulating. This extra step requires central executive processing. One point is allocated for each sequence correctly recited.

Vigilance: The examiner reads the list of letters at a rate of one letter per second, instructing the patient to tap only when they hear the letter A. This test measures the errors of omission (negligence) and errors of commission (impulsivity). This test requires both sustained and focused attention.

Serial 7s: The examiner gives the following instructions: "Now, I will ask you to count by subtracting seven from 100, and then, keep subtracting seven from your answer until I tell you to stop." This test measured basic arithmetic skills, attention and working memory.

**5. Language:**

Sentence Repetition. This test reflects the integrity of language processing systems at many different levels (speech perception, lexical (vocabulary) knowledge, grammatical skills and speech production supported by the left temporo-parietal frontal circuit. It additionally requires attention and concentration, supported by working memory systems of the frontal lobes.

Verbal Fluency: The examiner gives the following instruction: "Tell me as many words as you can think of that being with a certain letter of the alphabet in the next minute." The test requires coordination of lexicosemantic knowledge, shifting from word to word, working memory, searching strategy and inhibition of irrelevant words which all highly depend on frontal lobe function and is very sensitive to early stages of dementia.

**6. Abstraction:** The examiner asks the patient to explain what each pair of words has in common. The capacity for making and employing abstractions is considered to be essential to higher cognitive functions and requires semantic knowledge and conceptual thinking such as forming judgments, learning from experiences, and making inferences.

**7. Delayed Recall:** Several minutes following the five-word learning trials, the patient is asked to freely recall the words, followed by provision of categorical cues for unrecalled items. The score is calculated by adding one point to each word freely recalled. This test measures the verbal memory skills.

**8. Orientation:** Orientation is a fundamental mental function that processes the relations between the behaving self in space (places), time (events), and person (people).

**Final Score:** _____ 22/30

This screening test is suggestive of cognitive deficit in the following domains: Visuospatial/Executive, language, abstraction, delayed recall, orientation. Referral is recommended for a neuropsychologist.

_____
Mickaelle Dougherty Ph. D                    08/10/2021
Clinician                                     Date

_____
Dr.Konata Stallings, PsyD                     8/24/2021
                                              Date

139.    The number of hours associated with the fraudulent testing protocol employed, both in the aggregate and on a per day basis goes well beyond that which Stallings or any group of licensed psychologists could have legitimately performed and/or supervised.  What makes the scenario described in this complaint even more absurd is the fact that the fraudulent billing for testing and services that Stallings, SSP, Grody and the John Doe Defendants submitted or caused to be submitted through SSP constituted only a fraction of the <u>total</u> fraudulent billing for psychological evaluations, testing, and services that were submitted to <u>all</u> automobile insurers in the New York automobile insurance market.

140.    The instances outlined in this complaint only address billing from GEICO and do not include other automobile insurers, which, if counted, would make the hours two to three times greater if they received billing similar to that received by GEICO.

### vi.    The Fraudulent Use of the "1B" Modifier in Billing

141.    As part of the fraudulent scheme, Stallings, Grody and the John Doe Defendants submitted claims to GEICO including a "1B" modifier to further maximize the fraudulent reimbursement that they could extract from GEICO.

142.    Pursuant to the CPT codes set forth in the Fee Schedule, a "1B" modifier, "provides a 20 percent reimbursement increase for providers with the following WCB [Worker's Compensation Board] assigned provider rating codes: PN-P (Psychiatry), PN-ADP (Addiction Psychiatry), PN-PM (Pain Management), and PSY (Psychology)."

143.    As a part of the fraudulent scheme, Stallings, SSP, Grody and the John Doe Defendants used the "1B" modifier in bills submitted to GEICO to increase the already fraudulent charges 20% across the battery of Fraudulent Charges, without any documentation that the

providers purportedly providing the services had the prerequisite provider rating codes, furthering their fraudulent scheme to extract payments from GEICO to which they were never entitled.

### a.      The Fraudulent Billing for Independent Contractor Services

144.    The Defendants' fraudulent scheme also included the submission of claims to GEICO using SSP seeking payment for services provided by individuals that it never employed, but who were actually employed by Grody and paid through Oliver.

145.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors -- the healthcare services must be provided by the billing provider itself, or by its employees.

146.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

147.    From July 19, 2021 through February 28, 2022, more than five hundred (500) separate bills were submitted to GEICO seeking payment for the Fraudulent Services purportedly performed by individuals other than Stallings, while falsely representing in almost every bill that Stallings was the provider of the service in question.  This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who actually performed the services and their relationship to SSP, which Grody, Oliver and the John Doe Defendants were unlawfully operating and controlling.

148.    In fact, every NF-3 form that was submitted to GEICO by or on behalf of Grody, Oliver and the John Doe Defendants, falsely represented that Stallings, as the owner of the practice, actually performed the service – the following is a representative example:

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 3**

| 16.  IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Stallings Konata Solomon | Ph.D | Lic # 021895-01 | No | | |
| | | | | | |

149.    Additionally, every NF-3 form submitted to GEICO by the Defendants falsely represented that Stallings, as the owner of the practice, had actually reviewed and approved the billing for the services as well as the AOBs (assignment of benefits forms) that would have enabled direct payment to have been made to the sole proprietorship for services allegedly rendered to the patient.

150.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that the social workers and other unlicensed persons, and/or Dougherty, who performed the Fraudulent Services, were never: (i) employed by Stallings or SSP; (ii) under Stallings' direction and/or

control; or (iii) paid by Stallings.  In fact, they were performing services for multiple other "providers" that were being operated and controlled by Grody, Oliver and the John Doe Defendants at the same time they purported to provide services for Stallings and/or SSP.

151.    Because the Fraudulent Services were performed -- to the extent performed at all -- by individuals not employed by Stallings and/or SSP, the Defendants never had any right to bill or to collect No-fault benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all of the others identified in this complaint.  The misrepresentations and acts of fraudulent concealment outlined in this complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services when, in fact, GEICO was not.

### D.    The Fraudulent Billing for Treatment and Testing Never Provided by SSP

152.    As a part of the fraudulent scheme, Stallings, SSP, Grody and the John Doe Defendants used the "1B" modifier in bills submitted to GEICO to increase the already fraudulent charges 20% across the battery of Fraudulent Charges, without any documentation that the providers purportedly providing the services had the prerequisite provider rating codes, furthering their fraudulent scheme to extract payments from GEICO to which they were never entitled.

153.    The Defendants' fraudulent scheme also included billing on behalf of Insureds who never received any testing or treatment from SSP.

154.    On several instances where GEICO was billed for testing and services purportedly provided to Insureds by SSP, the Insureds reported to GEICO that they never received any treatment or testing by SSP. For example:

> (i)    On June 10, 2021, an Insured named TM was involved in an automobile accident. Thereafter, TM began treating at the Bryant Avenue Clinic. TM was then interviewed by a GEICO investigator regarding her treatment at

the Bryant Avenue Clinic. TM denied receiving any mental health counseling or psychological treatment. Despite this, GEICO received billing from SSP on behalf TM for the following purported testing on July 26, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(ii)     On June 24, 2021, an Insured named BP was involved in an automobile accident. Thereafter, BP began treating at the Rockway Avenue Clinic. BP was then interviewed by a GEICO investigator regarding his treatment at the Rockway Avenue Clinic. BP did not recall requesting to see or being told to see a psychologist. Furthermore, BP stated that he did not see a psychologist. Despite this, GEICO received billing from SSP on behalf of BP for the following purported testing on August 12, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iii)    On July 2, 2021, an Insured named VS was involved in an automobile accident. Thereafter, VS began treating at the Boston Road Clinic. VS was then interviewed by a GEICO investigator regarding his treatment at the Boston Road Clinic. VS stated that he was never referred to or requested to see a psychologist. Despite this, GEICO received billing from SSP on behalf of VS for the following purported testing on July 27, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iv)     On July 18, 2021, an Insured named MG was involved in an automobile accident. Thereafter, MG began treating at the Westchester Avenue Clinic. MG was then interviewed by a GEICO investigator regarding his treatment at the Westchester Avenue Clinic. MG denied receiving psychological treatment at any point throughout his treatment related to the accident. Despite this, GEICO received billing from SSP on behalf of MG for the following purported testing on July 27, 2021: (i) "psychiatric diagnostic

evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."; and

(v) On August 24, 2021, an Insured named BS was involved in an automobile accident. Thereafter, BS began treating at the Eastchester Road Clinic. BS was then interviewed by a GEICO investigator regarding his treatment at the Eastchester Road Clinic. BS denied ever speaking with or being told that he needed to see a psychologist. Despite this, GEICO received billing from SSP on behalf of BS for the following purported testing on August 32, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22." GEICO further received a bill from SSP on behalf of BS for "psychotherapy with patient, 45 minutes" in the amount of $165.94 using CPT code 90834 for the purported service date of September 14, 2021.

155.    These are just representative examples.

156.    Additionally, on several instances, where GEICO was billed for testing and services totaling seven (7) hours by SSP, the Insureds reported to GEICO that their "treatment" and "psychological testing" was for a significantly shorter duration. For example:

(i) On May 23, 2021, an Insured named VH was involved in an automobile accident. Thereafter, VH began treating at a Clinic located at 245 Rockaway Avenue, Brooklyn, New York (the Rockaway Avenue Clinic"). VH was then interviewed by a GEICO investigator regarding his treatment at Rockaway Avenue Clinic. VH stated that he saw a "female psychologist" on one occasion, who he was automatically referred to by the Rockaway Avenue Clinic, for approximately 20 minutes. Despite this, GEICO received billing from SSP on behalf of VH for the following purported seven (7) hours of testing on July 22, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(ii)     On June 18, 2021, an Insured named AG was involved in an automobile accident. Thereafter, AG began treating at the Clinic located at 62-69 99th Street, Rego Park, New York (the "99th Street Clinic"). AG was then interviewed by a GEICO investigator regarding his treatment at the 99th Street Clinic. AG stated that he saw a "female psychiatrist" on one occasion, who was recommended by the 99th Street Clinic, for approximately 15-20 minutes. Despite this, GEICO received billing from SSP on behalf of AG for the following purported seven (7) hours of testing on November 8, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iii)    On June 6, 2021, an Insured named DH was involved in an automobile accident. Thereafter, DH began treating at the Clinic located at 2184 Flatbush Avenue, Brooklyn, New York (the "Flatbush Avenue Clinic"). DH was then interview by a GEICO investigator regarding his treatment at the Flatbush Avenue Clinic. DH stated that he was "automatically referred" to a male psychologist at the Flatbush Avenue, and saw him on two occasions, which lasted approximately 10-15 minutes each visit. Despite this, GEICO received billing from SSP on behalf of DH for the following purported seven (7) hours of testing on July 20, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22.";

(iv)     On August 17, 2021, an Insured named TF was involved in an automobile accident. Thereafter, TF began treating at the Hillside Avenue Clinic. TF was then interviewed by a GEICO investigator regarding his treatment at the Hillside Avenue Clinic. TF stated that he was referred to a psychologist by the front desk receptionist at the Hillside Avenue Clinic and he received psychological treatment on one occasion which consisted of 5-6 minutes in which he completed a questionnaire and 10-15 minutes of speaking with the psychologist. Despite this, GEICO received billing from SSP on behalf of TF for the following purported seven (7) hours of testing on November 24, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B

(1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."; and

(v)    On July 22, 2021, an Insured named ST was involved in an automobile accident. Thereafter, ST began treating at the Flatlands Avenue Clinic. ST was then interviewed by a GEICO investigator regarding her treatment at the Flatlands Avenue Clinic. ST stated that she was told to see a psychologist on one occasion, that she filled out a questionnaire and then spoke with a male psychologist, and that the visit lasted approximately 20 minutes. Despite this, GEICO received billing from SSP on behalf of ST for the following purported seven (7) hours of testing on August 11, 2021: (i) "psychiatric diagnostic evaluation" using CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing per hour with patient" using CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobehavioral status exam by physician" using CPT code 96116-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" using CPT code 96118-1B (2 units), with a charge of $700.22."

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

157.    To support their fraudulent charges, Stallings and the John Doe Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, reports, assignment of benefits and other documents, in the name of SSP seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

158.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented SSP was legitimately owned and operated by Stallings, when, in fact, at all relevant times, SSP was secretly owned, operated, managed and controlled by Grody, Oliver and the John Doe Defendants for the purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented to GEICO that the Fraudulent Services that were provided, to the extent provided at all, were medically necessary and clinically indicated, when, in fact, the Fraudulent Services were provided pursuant to the dictates of Grody and other unlicensed laypersons, not based

on legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics;

(iii) The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented to GEICO that the Fraudulent Services were medically or psychologically necessary, when, in fact, the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv) The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(v) The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO that the Fraudulent Services were provided by Stallings, when, in fact, they were provided by unlicensed persons and unsupervised MSWs, in contravention of New York law; and

(vi) The NF-3 forms and other supporting documentation uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by individuals who were not employed by SSP, but who were instead employed by Grody and paid through Oliver.

## IV.   **Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

159.   Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

160.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme and went to great lengths to accomplish this concealment.

161.   Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that, at all relative times, SSP was unlawfully operated,

managed, and controlled by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

162.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that SSP derived their patient referrals through financial payments that the Defendants made to the Clinics/Referral Sources.  Indeed, the Defendants entered into complex financial arrangements with the Clinics/Referral Sources that were designed to, and did, conceal the nature of the financial and referral arrangements.

163.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed, to the extent performed at all, pursuant to a predetermined protocol that maximized the charges that Defendants could submit to GEICO.

164.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically and psychologically unnecessary and often were performed, to the extent performed at all, by: (i) unlicensed persons and unsupervised MSWs, in contravention of New York law; and (ii) by individuals who were not employed by SSP, but who were employed by Grody and paid through Oliver.

165.    The Defendants hired law firms to pursue collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

166.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner.  GEICO is also under statutory and contractual obligations to promptly

and fairly process claims within 30 days.  The facially-valid, verified documents submitted to GEICO in support of the charges at issue, combined with the material misrepresentations and litigation activity described above, were designed to and did cause GEICO to rely upon them.  As a result, GEICO has incurred damages of more than $500,000.00 dollars based upon payments made by GEICO in reliance on the charges that the Defendants submitted.

167.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Stallings and SSP
### (Declaratory Relief under 28 U.S.C. §§2201 and 2202)

168.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 167 above.

169.     There is an actual case and controversy between GEICO and Stallings/SSP, regarding more than $483,000.00 in pending billing submitted through SSP.

170.     Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO because SSP is a healthcare "practice" that was not at the relevant times, under the control and direction of Stallings, but rather, was secretly owned, operated, managed, and controlled by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

171.     Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the

Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

172.    Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

173.    Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO through SSP because, in many cases, the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

174.    Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO through SSP because the Fraudulent Services were: (i) provided by unsupervised MSWs, in contravention of New York law; and/or (ii) provided by individuals who were not employed by SSP, but who were employed by Grody and paid through Oliver.

175.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Stallings/SSP has no right to receive payment for any pending bills submitted to GEICO because: (i) SSP is a healthcare "practice" that was not at the relevant times, under the control and direction of Stallings, but rather, was secretly owned, operated, managed, and controlled by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or

referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the Fraudulent Services were: (a) provided by unsupervised MSWs, in contravention of New York law; and/or (b) provided by individuals who were not employed by SSP, but who were employed by Grody and paid through Oliver.

<u>SECOND CAUSE OF ACTION</u>
**Against Stallings, Grody, Oliver and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

176.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 175 above.

177.    SSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

178.    Stallings, Grody, Oliver and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of SSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that SSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of

Stallings, but rather, was secretly owned, operated, managed, and controlled by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were: (a) provided by unsupervised MSWs, in contravention of New York law; and/or (b) provided by individuals who were not employed by SSP, but who were employed by Grody and paid through Oliver.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

179.   SSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Stallings, Grody, Oliver and the John Doe Defendants operated SSP, insofar as SSP is not engaged in a legitimate psychology practice and acts of mail fraud, therefore, are essential for SSP to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that

Grody, Oliver and the John Doe Defendants continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through SSP to the present day.

180.     SSP has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through SSP in pursuit of inherently unlawful goals – namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

181.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $500,000.00 pursuant to the fraudulent bills submitted through SSP.

182.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<div align="center">

**THIRD CAUSE OF ACTION**
**Against Stallings, Grody, Oliver, the John Doe Defendants,**
**the Social Worker Defendants and Dougherty**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

</div>

183.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 182 above.

184.     SSP is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

185.     Stallings, Grody, Oliver, the John Doe Defendants, the Social Worker Defendants and Dougherty knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of SSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that SSP was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Stallings, but rather, was secretly owned, operated, managed, and controlled by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were: (a) provided by unsupervised MSWs, in contravention of New York law; and/or (b) provided by individuals who were not employed by SSP, but who were employed by Grody and paid through Oliver.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

186.    Stallings, Grody, Oliver, the John Doe Defendants, the Social Worker Defendants and Dougherty knew of, agreed to, and acted in furtherance of the common and overall objective

(i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

187.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $500,000.00 pursuant to the fraudulent bills submitted through SSP.

188.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against SSP, Stallings, Grody, Oliver and the John Doe Defendants
### (Common Law Fraud)

189.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 188 above.

190.    Stallings, SSP, Grody, Oliver and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of SSP's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

191.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

> (i)    In every claim, the representation that SSP was legitimately owned and controlled by Stallings, when, in fact, it was owned, operated, controlled and managed by Grody, Oliver and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

> (ii)   In every claim, the representation that the services that were billed were actually provided when, in fact, they were not;

(iii)    In every claim, the representation that the psychological services were eligible for payment, when, in fact, they were not eligible for payment because they were performed pursuant to unlawful kickback and/or financial arrangements amongst the Defendants and others;

(iv)    In every claim, the representation that the psychological services were provided by Stallings, when, in fact, the services were provided by independent contractors, unsupervised MSWs and other unlicensed persons who were not employed by Stallings or SSP, but who were employed by Grody and paid through Oliver; and

(v)    In every claim, the representation that the psychological services were medically necessary when, in fact they were not medically necessary because they were performed, to the extent they were performed at all, and billed pursuant to fraudulent predetermined protocols involving the dictates of unlicensed persons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

192.    Stallings, SSP, Grody, Oliver and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through SSP that were not compensable under New York no-fault insurance laws.

193.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result thereof has been injured in its business and property by reason of the above-described conduct, in that it has paid more than $500,000.00 pursuant to the fraudulent bills submitted by Stallings, Grody and the John Doe Defendants in the name of SSP.

194.    The extensive fraudulent conduct by Stallings, SSP, Grody, Oliver and the John Doe Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

195.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against the Social Worker Defendants and Dougherty
### (Aiding and Abetting Fraud)

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 195 above.

197.    As set forth herein, the Social Worker Defendants and Dougherty knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Stallings, Grody and the John Doe Defendants using SSP.

198.    The conduct of the Social Worker Defendants and Dougherty in furtherance of the fraudulent scheme was significant and material.  The conduct of the Social Worker Defendants and Dougherty was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Stallings, SSP, Grody, Oliver or the John Doe Defendants to obtain payment from GEICO and from other insurers using SSP.

199.    The Social Worker Defendants and Dougherty aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to SSP for psychologically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

200.    The conduct of the Social Worker Defendants and Dougherty caused GEICO to pay more than $500,000.00 pursuant to the fraudulent bills submitted through SSP.

201.    The Social Worker Defendants and Dougherty's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<div align="center">

**SIXTH CAUSE OF ACTION**
**Against All Defendants**
**(Unjust Enrichment)**

</div>

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 202 above.

204.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or on behalf of SSP for no-fault insurance charges, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

206.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

207.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

208.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $500,000.00.

## **JURY DEMAND**

209.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Stallings/SSP, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that SSP has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Stallings, Grody, Oliver and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Stallings, Grody, Oliver, the John Doe Defendants, the Social Worker Defendants and Dougherty, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against SSP, Stallings, Grody, Oliver and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $500,000.00 together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.     On the Fifth Cause of Action against the Social Worker Defendants and Dougherty compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$500,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Cause of Action against all Defendants, for more than $500,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: October 18, 2022

RIVKIN RADLER LLP

By: ____/s/ Barry I. Levy, Esq.____
    Barry I. Levy, Esq.
    Michael Vanunu, Esq.
    Allison N. Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*